**Robert L. GOLDBERG et al.**

v.

**Bernard ROSTKER et al.**

Civ. A. No. 71–1480.

United States District Court,
E. D. Pennsylvania.

July 18, 1980.

As Amended July 22 and Aug. 6, 1980.

---

Donald L. Weinberg, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for plaintiffs.

William Z. Elliott, U. S. Dept. of Justice, Washington, D. C., for defendants.

Before ROSENN, Circuit Judge, LORD, Chief District Judge and CAHN, District Judge.

## MEMORANDUM

CAHN, District Judge.

## I. PRELIMINARY STATEMENT

Before this three-judge court is the issue of the constitutionality of the selective service registration of males only, as provided for in the Military Selective Service Act, 50 U.S.C.App. § 451 *et seq.* (hereafter MSSA). In preliminary proceedings we set forth the history of this case, *Goldberg v. Tarr,* —— F.Supp. ——, No. 71–1480 (E.D.Pa. Feb. 19, 1980).[1] We will not repeat it here. In that opinion we identified plaintiffs' constitutional argument as follows:

> [T]heir rights to equal protection of the law, as that concept is included in the due process clause of the Fifth Amendment, are violated in that males only are subject to registration for the draft, and therefore there is an increased probability of the male plaintiffs actually being inducted because the pool of draft eligibles is decreased by the exclusion of females.

*Goldberg v. Tarr, supra,* slip op. at 7. Plaintiffs allege that they are harmed as a result of a gender classification that cannot be justified under applicable standards of constitutional review.

Subsequent to our opinion, *Goldberg v. Tarr, supra,* we granted the unopposed motion of Owen F. Jones to intervene as a party-plaintiff in this action.[2]

The parties have submitted a five volume Joint Documentary and Stipulated Record and filed extensive briefs.[3] On July 1, 1980, at oral argument, we granted plaintiffs' motion for class certification under Fed.R. Civ.P. 23(b)(2).[4] The class has been defined

---

1. Curtis Tarr was the Director of the Selective Service System at the time this suit was filed. Bernard Rostker, the new Director, was substituted for Mr. Tarr as a defendant by stipulation of the parties filed July 15, 1980.

2. Owen F. Jones is a 19 year old male citizen of the United States, residing within the Eastern District of Pennsylvania, and is under compulsion of law to register with the Selective Service System between July 21 and August 4 of 1980.

3. Although our Order of February 19, 1980, contemplated a hearing to develop a factual record, the parties were able to rest on the basis of their Joint Documentary and Stipulated Record. The Government Printing Office produced an illegible pagination of the Documentary and Stipulated Record, Volume I through IV. Therefore, we will cite to the page of the actual document included in that record, without citation to the record pages. We will order counsel for defendants to repaginate the record and submit it to us with the record page

citations for all citations to documents in the record contained in this opinion where the record page has not been cited because of illegibility.

4. Also, at oral argument several oral motions to join were made and denied. Formal written motions were subsequently filed. The movants were as follows. Movant Stephen Retherford is a male citizen of the United States, born September 24, 1951, who resides in Richmond, Virginia. In 1969 Mr. Retherford was required to and did register with the Selective Service System. He was given a student deferment until 1971 when he was reclassified 1–H. Movant Bruce Josephs is a male citizen of the United States, born November 30, 1956, who resides within the Eastern District of Pennsylvania. Mr. Josephs registered with the Selective Service System in 1975, and was given a student deferment, 2–S classification, which he still holds. Both Mr. Retherford and Mr. Josephs allege they remain liable for involuntary service and training under 50 U.S.C.App. § 467.

to include all male persons who are registered or subject to registration under 50 U.S.C.App. § 453 or are liable for training and service in the armed forces of the United States under 50 U.S.C.App. §§ 454, 456(h) and 467(c).

The following legislative and executive actions have occurred after the filing of defendants' motion for summary judgment which was the subject of our opinion in *Goldberg v. Tarr, supra.*[5] The President and representatives of the military services and the Selective Service System recommended reinstatement of selective service registration, with an amendment of the MSSA to allow the inclusion of females in that registration.[6] The recommendation to amend the MSSA to eliminate the exclusion of females was defeated. However, the House and Senate passed Joint Resolution

521 on June 12, 1980, which allocated $13,-285,000 for salaries and expenses of the Selective Service System for the fiscal year ending September 30, 1980. This appropriation was to allow renewal of all-male selective service registration. On June 16, 1980, the Selective Service System promulgated new regulations setting forth revised procedures for registration. 45 Fed.Reg. 40577 (June 16, 1980). Joint Resolution 521 was signed by President Carter on June 28, 1980. On July 2, 1980, President Carter issued Presidential Proclamation No. 4771, providing for the commencement of selective service registration on July 21, 1980. 45 Fed.Reg. 45247 (July 2, 1980). Under the Proclamation and regulations, males born in 1960 must register during the week of July 21, 1980, at a United States Post Office. During the following week all males born in 1961 must register. There

---

Movant Ross Hunter is a male citizen of the United States, born September 15, 1961, residing within the Eastern District of Pennsylvania. Mr. Hunter is under compulsion of law to register with the Selective Service System between July 21 and August 4, 1980.

We also denied the then pending written motions of Carter Faust and Steven Goldberg to intervene as party-plaintiffs. Faust and Goldberg are male United States citizens residing in the Eastern District of Pennsylvania. They were born in 1961 and 1960, respectively. The apparent purpose for their motion to intervene was to permit their counsel, The American Civil Liberties Union (ACLU), to enter the case. The ACLU had already participated in preparing the briefs and in compiling Volume V of the Joint Documentary and Stipulated Record.

Finally, we denied the written motion of Robert J. LaRocca to join as a party-plaintiff. Robert J. LaRocca, is a male citizen of the United States, born August 8, 1946, who resides within the Eastern District of Pennsylvania. Mr. LaRocca registered with the Selective Service System in 1966. At that time he received a deferment as a student (2–S classification) and in 1968 received a deferment as a teacher (2–A classification). In 1974 Mr. LaRocca left the teaching profession, but reclassifications were no longer being processed by the Selective Service. Mr. LaRocca is now an attorney associated with the firm representing plaintiffs, Kohn, Savett, Marion and Graf, in Philadelphia. The grounds for Mr. LaRocca's deferments no longer exist and Mr. LaRocca is subject to conscription and training under the MSSA until he reaches the age of thirty-five in 1981.

We denied these motions because movants are members of the class.

**5.** In our opinion we stated that:

There are four bases for defendants' summary judgment motion. Defendants contend the matter is moot, the plaintiffs lack standing, the plaintiffs seek an advisory opinion and the issue of a male-only draft is a nonjusticiable political question.

*Goldberg v. Tarr, supra,* slip op at 5. In that opinion, we dismissed the fourth basis for defendants' motion—that the issue before us is a nonjusticiable political question—because the Court of Appeals for the Third Circuit had previously rejected that contention. *Rowland v. Tarr,* 480 F.2d 545 (3d Cir. 1973). We also determined that we needed an amplification of the record before we could decide the remaining contentions. Therefore, the motion for summary judgment was denied.

**6.** Presidential Recommendation for Selective Service Reform: A Report to Congress Pursuant to P.L. 96–107 (February 11, 1980), Record at 196; Testimony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Military Personnel of the House Armed Services Committee (March 5, 1980), Record at 958; Testimony of Richard Danzig, Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee (March 19, 1980), Record at 812, *et seq.*; Testimony of Bernard D. Rostker, Director of the Selective Service System, before Subcommittees of the Senate and House Armed Services Committees (March 5 and 19, 1980), Record at 841 and 974.

are approximately four million male citizens who were born in 1960 and 1961. No further registrations have been been ordered at this time.

## II. JURISDICTION

Defendants argue that this court has no jurisdiction to adjudicate the claims of the plaintiffs because plaintiffs lack standing and the case is not ripe for review. We now consider these contentions.[7]

### A. STANDING

■ To establish standing to bring this action plaintiffs must demonstrate that they face a distinct and palpable injury with a fairly traceable causal connection to the challenged conduct. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). In *Duke Power* the plaintiffs were a group of residents of areas near two nuclear power plants which were under construction. Plaintiffs challenged the constitutionality of a federal statute which limited the aggregate liability of the plant operators to $560 million per nuclear "incident." The Court considered the potential effect of the operation of the two plants to be built, and determined that the threat of prospective environmental and thermal pollution to two lakes in the vicinity was sufficient to meet the "injury in fact" requirement of the standing test. Evidence that the plants would not have been built without the limitation on liability supplied the "causal connection." The Court held that it was not necessary for pollution to enter the environment before the plaintiff had standing.

Similarly, the Court has held that plaintiffs had standing in cases where the alleged injury was even more. attenuated than that in *Duke Power. See United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (law students had standing to oppose regulations which could result in increased litter in parks which they used). *See also Americans*

*United for the Separation of Church and State, Inc. v. H. E. W.*, 619 F.2d 252 (3d Cir. 1980).

■ In the instant case the harm to the plaintiffs is neither remote nor hypothetical. Those members of the class born in 1960 and 1961 are under compulsion of law to present themselves for registration with the Selective Service System (Selective Service) between July 21, 1980, and August 4, 1980: Presidential Proclamation No. 4771, 45 Fed.Reg. 45247 (July 2, 1980). The MSSA provides:

[A]ny person who ... evades or refuses registration or service in the armed forces or any of the requirements of this title ... or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title ... shall, upon conviction ... be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment....

50 U.S.C.App. § 462.

Thereafter these registrants are under a continuing obligation to inform Selective Service of any changes of address, and to maintain proof of registration. 45 Fed.Reg. 49,577 (June 16, 1980); 32 C.F.R. § 1641. In addition, the statute requires that:

[E]ach registrant shall be immediately liable for classification and examination, and shall, as soon as practicable following his registration, be so classified and examined, both physically and mentally, in order to determine his availability for induction for training and service in the Armed Forces.

50 U.S.C.App. § 454(a). Those members of the plaintiff class who registered before April 1, 1975, are under a current legal obligation to maintain their registration and report their changes of residence to the Selective Service.[8] Those plaintiffs already

---

7. The litigants agree that mootness is no longer an issue given the congressional and executive actions detailed above and the intervention of Owen F. Jones.

8. Proclamation No. 4360 issued by President Ford terminated registration on April 1, 1975. 40 Fed.Reg. 14567 (April 1, 1975). Those registered before 1975 were given a Registration

registered are subject to potential reclassification and induction into the armed services.

In this factual context it is clear that the class has standing to raise the issue before us. However, in analyzing these issues it becomes evident that the class contains three subclasses of individuals, one of which does not have standing.

1. Those individuals registered with the Selective Service System before Presidential Proclamation No. 4360 terminated registration on April 1, 1975, and who remain liable for involuntary training and service.

2. Those individuals required to register with the Selective Service System between July 21, 1980, and August 4, 1980.

3. Those individuals who have never been registered with the Selective Service System and are not under any compulsion to register in the near future.

■ Because we find that registration itself and the continuing obligations placed on registrants under both the old and new selective service regulations are a sufficient intrusion on an individual's rights, the members of the first two subclasses have standing in this case. However, we find no distinct and palpable harm nor imminent threat of concrete harm to the third subclass of individuals sufficient to establish standing in the instant case. Therefore, in the order accompanying this opinion we will redefine the class to exclude this third subclass.

We are convinced that class plaintiffs, as they will now be defined, have "alleged such a personal stake in the outcome of the controversy so as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The causal connection between the current and imminent aspect of the alleged harm and the allegedly unconstitutional legislation is direct and requires no difficult factual inquiry. The statute attacked is the statute which imposes the burdens on plaintiffs.

**B. RIPENESS**

■ The ripeness inquiry involves two steps: first, we must determine if there is a "case or controversy" before the court within the meaning of Article III of the Constitution; second, we must examine prudential reasons for accepting or declining jurisdiction at this time, considering whether " 'we will be in no better position later than we are now' to decide this question." *Duke Power Company v. Carolina Environmental Study Group, Inc., supra* at 82, 98 S.Ct. at 2635, *quoting in part, Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143–144, 95 S.Ct. 335, 358–359, 42 L.Ed.2d 320 (1974).

■ Addressing the "case or controversy" requirement in *Duke Power* the Court said:

Our conclusion that appellees will sustain immediate injury from the operation of the disputed power plants and that such injury would be redressed by the relief requested would appear to satisfy this requirement.

438 U.S. at 81, 98 S.Ct. at 2634. Similarly in the instant case our finding that plaintiffs suffer current or imminent harm satisfies the constitutional requirement that

Certificate and Notice of Classification. We take judicial notice of the Registration Certificate which states:

The law requires you to have this Registration Certificate in your personal possession until your liability for service and training is terminated or to surrender it upon entering active duty in the Armed Forces.

The Notice of Classification states:

The Military Selective Service Act requires you to have this Notice of Classification in addition to your Registration Certificate in your personal possession until your liability for training and service is terminated or until you turn it in upon entering active duty in the armed forces.

plaintiffs present a live case or controversy to the court and that they do not seek an advisory opinion.

Prudential concerns strongly suggest that this case is ripe. Defendants argue that this case will not be ripe until military mobilization and induction of registrants take place. Time cannot appreciably clarify the record before us. Delay until a period of national emergency occurs would require us to decide sensitive constitutional issues in an atmosphere of urgency which might intrude upon a well-considered adjudication. Also, were we to wait until actual mobilization, Congress may well find itself faced with the necessity of revising and reshaping legislation of monumental importance in an atmosphere totally unconducive to measured thought.[9]

Defendants' argument on both standing and ripeness can be reduced to their assertion that registration alone is so inconsequential and so minor a requirement that we should not adjudicate this case at this time. Free people abhor any governmental intrusion into privacy and such intrusions are tolerated only as justified by the needs of society. We will accept no argument that intrusions are inconsequential and beneath the recognition of a federal court. The concept that the government can, without justification, require any group of Americans to register and continually report their whereabouts is constitutionally unacceptable. The reasons for any intrusions by the government must always be open to scrutiny under the Constitution. The justification for registration in the instant case is the need to conscript armed forces in an orderly manner to meet the defense needs of the nation. This purpose is clearly valid. However, the need to register men only, and the need not to register women, is not so apparent.

Registration is a sufficient intrusion on the rights of any citizen to allow this court to adjudicate the constitutionality of that registration. We need not wait, and should not wait, until the governmental intrusion on the individual's civil rights reaches maximum proportions and the nation is in a time of crisis.[10] The case is ripe.

## III. THE CONSTITUTIONALITY OF AN EXCLUSIVELY MALE REGISTRATION FOR SELECTIVE SERVICE

### A. THE STANDARD OF REVIEW TO DETERMINE IF GENDER–BASED DISCRIMINATION IS UNCONSTITUTIONAL

The defendants concede that selective service registration of males only constitutes discrimination based on gender and that "defendants thus have the burden of justifying that classification." Defendants' Reply Brief on Burden of Proof, at 3. The litigants part company, however, on exactly what test or standard this court should apply in making the determination of whether or not the defendants have met the burden of justifying the exclusion of females from registering for selective service.

 The opinions of the Supreme Court have established three standards of review which may be applied in analyzing discriminatory classifications under the Equal Protection clause and the Fifth

9. Bernard D. Rostker, Director of the Selective Service System, testified that it would be disruptive to have a court intervene in a post-mobilization environment. Deposition of Rostker, at 43 (May 13, 1980). The Department of Defense itself was concerned over the problems that might arise were this issue litigated in a time of emergency mobilization. Deposition of Richard Danzig, Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs, and Logistics at 9–10. Even Senator Nunn, steadfastly opposed to the registration of women, wanted no legal challenge in wartime. *See* Statements of Wellford, Rostker and Danzig before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 18–19. (March 19, 1980).

10. Defendants argued that the case would not be ripe until July 21, 1980, when the first registration is to begin. It would be unconscionable to delay our decision until then. Millions of dollars of taxpayers' funds would be wasted if we delayed granting relief until after the registration began. We believe this case ripe for adjudication, and prudence argues forcefully against delay.

Amendment to the United States Constitution. Any statutory discrimination, at a minimum, must bear a reasonable relationship to a permissible governmental purpose (hereinafter the "reasonable relationship" test). *McDonald v. Board of Election*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). Ordinarily, statutory classifications based on gender are unconstitutional unless they are substantially related to an important government interest (hereinafter the "important government interest" test). *Wengler v. Druggists*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *cf. Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion). Racial or religious classifications or other "suspect" classifications will be unconstitutional unless they are necessary to accomplish a compelling state interest (hereinafter the "compelling government interest" test). *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

The plaintiffs first urge that registration may lead to induction into military service and military service necessarily infringes upon fundamental rights. *See, e. g., Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Therefore, they argue, defendants must establish that the discrimination is essential to the accomplishment of a "compelling government interest." Moreover, plaintiffs claim the draft creates an irrebuttable presumption that women are unqualified and that such a presumption should give rise to the highest level of scrutiny. *Stanley v. Illinois*, 405 U.S. 645, 654–56, 92 S.Ct. 1208, 1214–15, 31 L.Ed.2d 551 (1972). In the alternative, plaintiffs maintain the defendants are obligated to establish that the gender-based discrimination serves "important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456,

50 L.Ed.2d 397 (1976). *See also Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 152, 100 S.Ct. 1540, 1546, 64 L.Ed.2d 107, 116 (1980).

The defendants contend that the "compelling government interest" test is not applicable to gender-based discrimination cases. Although defendants recognize that the "important government interest" test is generally applied to gender based discrimination, they argue that it should not be applied here. Defendants argue that under *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) the judicial branch should extend great deference to Congress in military affairs. Therefore, they argue, in the context of this litigation the exclusion of females from the registration process is constitutional if defendants establish merely that the exclusion is rationally related to permissible military objectives.

█ We decide that the appropriate standard to apply is the "important government interest" test.

█ In *Personnel Administration of Mass. v. Feeny*, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979), the Court summarized the general standard of review in sex discrimination cases stating:

Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination. *Caban v. Mohammed*, 441 U.S. 380, 398 [99 S.Ct. 1760, 1771, 60 L.Ed.2d 297] (Stewart, J., dissenting). This Court's recent cases teach that such classifications must bear a close and substantial relationship to important governmental objectives, *Craig v. Boren*, 429 U.S. 190, 197 [97 S.Ct. 451, 456, 50 L.Ed.2d 397], and are in many settings unconstitutional. *Reed v. Reed*, 411 U.S. 677 [93 S.Ct. 1764, 36 L.Ed.2d 583]; *Weinberger v. Wiesenfeld*, 420 U.S. 636 [95 S.Ct. 1225, 43 L.Ed.2d 514]; *Craig v. Boren, supra; Califano v. Goldfarb*, 430 U.S. 199 [97 S.Ct. 1021, 51 L.Ed.2d 270]; *Orr v. Orr*, 440 U.S. 268 [99 S.Ct. 1102, 59 L.Ed.2d 306].

"The burden ... is on those defending the discrimination to make out the claimed justification ...," *Wengler v. Druggists Medical Ins. Co.*, 446 U.S. 142, 152, 100 S.Ct. 1540, 1546, 64 L.Ed.2d 107, 116 (1980), and the degree to which a "sex centered generalization actually compare[s] with fact" must be substantial. *Craig v. Boren*, 429 U.S. 190, 199, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). This relationship between generalization and actual fact must be shown by empirical evidence. *Id.* at 200–203, 97 S.Ct. at 458–460. Outdated stereotypical notions are not a valid basis for gender discrimination. Administrative convenience is not a valid basis for sex discrimination. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). As with other gender discrimination cases brought by or on behalf of males, *e. g. Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Craig v. Boren, supra; Wengler v. Druggists, supra*, the Court has observed that "the statute discriminates against both men and women." *Wengler v. Druggists, supra*, 446 U.S. at 147, 100 S.Ct. at 1544, 64 L.Ed.2d at 113, and has analyzed the nature of the burden on women. So too, in this case. Moreover, as in *Wengler* we need not inquire whether a statute is intended to benefit or burden women; the same standard applies. *Wengler v. Druggists*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). The rationale of this rule is that any discrimination stigmatizes women. Gender discrimination is a badge of inferiority and must pass constitutional review whether or not it is arguably for the benefit of women.[11] *See University of California Regents v. Bakke*, 438 U.S. 265, 360, 98 S.Ct. 2733, 2783, 57 L.Ed.2d 750 (1979) (Opinion of Justices Brennan, White, Marshall and Blackmun). Equal protection involves protection from seemingly well-intended classifications that in fact relegate women to an inferior status. In the instant case it is admitted that a statutory gender classification exists and we are bound to apply these principles as enunciated by the Supreme Court.

▇▇▇ We reject plaintiffs' arguments that the compelling government interest test is appropriate, or that an irrebuttable presumption analysis should be applied. It is true that the compelling interest test will be applied where fundamental rights are involved. *See, e. g., Shapiro v. Thompson*, 329 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In *Rowland v. Tarr*, 480 F.2d 545 (3d Cir. 1973) (per curiam), the Court of Appeals for the Third Circuit dismissed several of plaintiffs' due process challenges to the draft as precluded by Supreme Court precedent. In other words, the fact that individual rights are infringed in a draft has already been held to be constitutional. The issue remaining in this case is whether the deprivation of rights is applied equally between the sexes. Thus, the key focus is on the difference in the sexes, not the nature of the deprived right.

▇▇▇ A simple example makes very clear why strict scrutiny is not applicable here. If a twenty-six year old male brought suit claiming that the fact that twenty-seven year old males are not subject to the MSSA[12] violated his right to equal protection, a "reasonable relationship" test would be applied. There is no reason for heightened scrutiny to protect twenty-six year old males as a group, as exists when the government classifies people by race, religious beliefs, or gender. A strict scrutiny of the classification would not be triggered because induction invades fundamental rights if the classification is unrelated to the fundamental right. That is a due process issue, not one of equal protection of twenty-six year old males and twenty-seven year old males. We would examine the reasons for induction separately from the reasons for the classification. Induction can be justified as necessary to the compelling government interest in defending the nation. The classification would only have to be justified by administrative conve-

---

11. Congress itself declared service in the armed forces under the MSSA to involve both "obligations and privileges." 50 U.S.C.App. § 451(c).

12. Except when they were previously deferred.

nience. In the instant case, there is no rationale to apply a higher level of scrutiny than is normally applied to gender based classifications.

Plaintiffs' second argument is that the MSSA creates an "irrebuttable presumption." If the posture of this case were similar to irrebuttable presumption cases, women would be challenging the irrebuttable presumption that they are not qualified for registration and induction. In fact, men are challenging what they claim is an irrebuttable presumption that only men are qualified (and therefore subject to the burdens of induction). Unlike the traditional irrebuttable presumption cases, there is no way a male can rebut this presumption through his own conduct or history, *cf. Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1975). Thus the approach of cases—that the state may use the presumption so long as it is rebuttable—has no application here. For example, in *LaFleur*, the Court held that a public school teacher must be allowed to show she is fit to continue teaching past the fourth month of her pregnancy. In *Vlandis*, as well as other cases, the person protesting the irrebuttable presumption was the one deprived of the benefit. Similarly, in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), an unwed father challenged a presumption that all unwed fathers are unqualified to raise their out-of-wedlock children. These irrebuttable presumption cases are merely recast due process cases where a party is asserting that the presumption deprives him of a constitutional right. Thus, the heightened level of scrutiny applies where the presumption operates against a party to deprive that party of a fundamental right. In sum, applying an irrebuttable presumption analysis to a challenge by men to the male-only registration obfuscates more than it clarifies.

We reject defendants' suggestion that because of deference to Congress in military matters the judicial branch should apply the least stringent "rational basis" test to gender discrimination. The government argues that *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), creates an exception to the "important government interest" test in cases involving the military and that therefore a "rational relation" test applies. In *Ballard*, a male naval officer with more than nine years of active service who failed to secure a promotion and under Navy regulations was subject to mandatory discharge, brought suit claiming that allowing women thirteen years in grade before a mandatory discharge violated his equal protection rights. The Court analyzed the scheme and stated that administrative convenience would not be sufficient to justify the disparate treatment. *Id.* at 506–07, 95 S.Ct. at 576–77. But the Court concluded that the distinction was justified because "male and female ... officers ... are *not* similarly situated with respect to opportunities for professional service." *Id.* at 508, 95 S.Ct. at 577.

According to the defendants, the *Ballard* Court applied the "rational basis" test in deciding that the male naval officers were not subjected to unconstitutional gender-based discrimination, and that deference to Congress in military matters was the reason for the application of that standard. We disagree with defendants for several reasons. First, the case explicitly says that administrative convenience would not justify the discrimination. In the "rational relation" line of cases administrative convenience is sufficient to justify discrimination. Second, the Court never articulates the standard it applied. Third, the classes in *Ballard* were *not* similarly situated so the Court was not confronted with deciding the appropriate standard where the classes *are* similarly situated. Finally, a year later in *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976), the Court said a gender classification will be upheld only if it serves an important governmental objective and is substantially related to achievement of that objective. *Craig v. Boren* has been consistently followed to date. The government fails to cite any

other cases where the "rational relation" test is held to be appropriate in reviewing gender based classifications.

Finally the test to apply in determining if gender-based discrimination is constitutional should not vary from one factual context to another. The standard is a constant. If any judicial deference is due the Congress it should be extended in the determination of whether the standard is met, not in the definition of what the standard is. It would be an incorrect and dangerous concept for the judiciary to apply a less stringent test to possible constitutional violations committed by the Congress or the executive in exercising war powers. That power is precisely the power which historically can infringe most substantially on the civil rights of citizens and therefore may be the one most in need of an appropriate check and balance. In *Ex Parte Milligan*, 71 U.S. 2, 125, 18 L.Ed. 281 (1866), the Court, in discussing whether constitutional safeguards may be restricted in times of crisis, held:

> Not one of these safeguards can the President, or the Congress, or the Judiciary disturb except the one concerning the writ of *habeas corpus*.

In *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the Court did not apply a lesser standard because of war-time emergency; indeed, it articulated for the first time the strict scrutiny test and found that the government had met its heavy burden.

■ Ordinarily deference is due to congressional and executive decisions in military matters. We are not here concerned with military operations or day to day conduct of the military into which we have no desire to intrude.

The issue before us is whether exclusion of women is substantially related to an important governmental function. This issue does not involve the court in determining how the military should utilize women in any given situation. The issue before us is the constitutionality of the total exclusion of women from the MSSA, not the extent to which the military services must utilize women.

We will examine the purported justifications for the gender based exclusion. If the purported justifications do not support this exclusion, or if the purported justifications are invalid as a matter of law, or if the purported justifications are contradicted by Congress's own actions or the overwhelming evidence on the record, then we will be required to declare the discriminatory statute unconstitutional.

## B. DEFINITION OF THE QUESTION FOR REVIEW

Before reviewing the evidentiary record it is important to define what we are reviewing under the standard delineated above. Before us is a program which requires the registration of males but completely excludes females from registration and possible induction into the armed services under the MSSA.

The defendants urge us to consider registration independently of induction because, as they argue, induction is not imminent. If we did what the defendants requested, this case would be simple. Registration of a class of citizens with absolutely no purpose would be unconstitutional under any standard of review. The imposition of the burden to register upon any class of citizens must be justified. The justification here should relate to the governmental need to raise military forces by conscription. We can consider the registration only in light of its justification.

Congress could not constitutionally require registration under the MSSA of only black citizens or only white citizens, or single out any political or religious group simply because those groups contain sufficient persons to fill the needs of the Selective Service System. It is not enough to show that their inclusion was needed; it would have to be shown that their exclusion was needed. In the instant case, the classification is gender-related and must meet the standard we found to apply in Section IIIA of this opinion. To summarize, we need only decide if there is a substantial relation-

ship between the exclusion of women and the raising of effective armed forces.[13] We need not decide if women must serve in all roles in the military, including combat. We need not decide if women must be conscripted in equal numbers to men.

This careful consideration of what issues are and are not before us should dispel any concern that we are injecting ourselves in an inappropriate manner into military affairs. *See Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Owens v. Brown*, 455 F.Supp. 291 (D.D.C. 1978).

### C. THE APPLICATION OF THE "SUBSTANTIAL RELATIONSHIP" TEST TO DETERMINE IF EXCLUSIVELY MALE REGISTRATION IS CONSTITUTIONAL

■ It is defendants' burden to establish that the exclusion of females from registration for selective service promotes an important government objective and is substantially related to the achievement of that objective. *Wengler v. Druggists Mutual Insurance Co., supra*. Despite the extensive record compiled in this case defendants simply have not met this burden.[14]

We have combed the record and the legislative history for purported justifications for the total exclusion of women from the MSSA, and we find each proffered justification unconvincing.[15] The legislative history accompanying the renewal of registration and the rejection of female registration sets forth several arguments for the exclusion of women. Many of these arguments do not justify the exclusion of women. The report of the full Senate Armed Services Committee states the following:

> The committee feels strongly that it is not in the best interest of our national defense to register women for the Military Selective Service Act, which would provide needed military personnel upon mobilization or in the event of a peacetime draft for the armed forces.
>
> The committee is aware of the significant contribution now being made to our

---

**13.** Government attorneys and representatives of the Department of Defense repeatedly explained to Congress that they could not justify the exclusion of women solely because there were enough males to meet any anticipated needs of the Selective Service System.

> [T]he question of military necessity for drafting women is irrelevant to the Constitutional issue, which is whether or not there is sufficient justification by whatever test the courts may apply for not registering women.

Testimony of Mr. Sims, Attorney for the Department of Justice before the Subcommittee on Manpower and Personnel of the Senate Armed Service Committee at 27 (March 19, 1980).

However, Congress generally continued to analyze the problem in terms of the need for women, not the need to exclude women.

**14.** Other courts which have considered the constitutional issue before us in the context of a proposed male inductee's defense to a criminal selective service violation [*see Goldberg v. Tarr*, No. 71–1480 (E.D.Pa. Feb. 19, 1980)] have not had the benefit of the voluminous record submitted here which contains recent data on the performance of females in the military.

**15.** When the MSSA was adopted in 1948 an aura of male chauvinism permeated Congressional attitudes toward women in the military.

During the same year Congress adopted a statute known as the Womens Armed Services Integration Act, 5 U.S.C. § 627. An example from the Congressional Record-House, June 2, 1948, page 6970 is illustrative:

> MR. VANZANDT: That is correct. We have a similar nurses organization for the Navy.
>
> Let me point out the position of the enlisted man. There is not a member of the House Committee on Armed Services who has not received a telephone call or a call in person from enlisted men objecting to the idea of having to take orders from a WAVE officer. Put yourself in the position of an enlisted man and I am sure you will agree with them.

The government has acknowledged that the legislative history of the 1948 Act is of little use to their case. Therefore, we will not examine that legislative history in depth.

> The reason for that is, to summarize that legislative history, it is replete with—and unfortunately replete—only with the kind of sexual stereotypes and that kind of thinking that the Court has subsequently held will not support the constitutionality of a legislative act of Congress.

Testimony of Mr. Sims, Attorney for the Department of Justice, before the Subcommittee on Military Personnel of the Committee on Armed Services of the House of Representatives at 18 (March 5, 1980).

armed forces by women in uniform. The number of women in the military has increased significantly in the past few years and is expected to continue to increase.

. . . .

Women now volunteer for military service and are assigned to most military specialties. Of all the various kinds of enlisted skills in the Army, only 6 percent are closed to women as a result of the exclusion of women from combat. But these include infantry specialists, armor specialists, combat engineers and positions in field artillery and air defense. It is in these skills, and more specifically in the many positions needed to be filled in infantry and armor skills, where mobilization manpower is so severely short. It is also these skills that are most difficult to recruit for during peacetime. Even in peacetime, although only 6 percent of Army enlisted skills are closed to women, fully 42 percent of all *billets* filled by enlisted personnel in the Army are in specialties, skills or units not available to women. Consequently, there is no need to draft large numbers of women in event of mobilization or for the skills that the Army has difficulty in recruiting for in peacetime.

In addition, there are military reasons that preclude very large numbers of women from serving. Military flexibility requires that a commander be able to move units or ships quickly. Units or ships not located at the front or not previously scheduled for the front nevertheless must be able to move into action if necessary. In peace and war, some rotation of personnel is necessary. We should not divide the military into two groups—one in permanent combat and one in permanent support. Some non-combat positions must be available to which combat troops can return for duty before being redeployed.

The committee also feels that any actual induction under the Military Selective Service Act should be performed equitably based on random selection, and as efficiently as possible. But this principle creates additional mobilization problems if women were included. Meeting a large requirement will not be easy in any event, and the committee feels that inflating the total for positions not directly needed for combat would impede the mobilization process. Processing and training would be needlessly burdened by women recruits who could not be used in combat. If more people can be processed, they should also be directed to the combat positions which need to be filled.

Other administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards would also exist but are less important than military reasons.

Registering women for assignment to combat or assigning women to combat positions in peacetime then would leave the actual performance of sexually mixed units as an experiment to be conducted in war with unknown risk—a risk that the committee finds militarily unwarranted and dangerous. Moreover, the committee feels that any attempt to assign women to combat positions could affect the national resolve at the time of mobilization, a time of great strain on all aspects of the Nation's resources.

Requiring Reinstitution of Registration for Certain Persons Under the Military Selective Service Act, and for Other Purposes, Report No. 96–226 to accompany S.109 at 8–9 (9th Cong. 1st Sess.).

The Subcommittee on Manpower and Personnel made the following specific findings of fact:

1) Article I, section 8 of the Constitution commits exclusively to Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for government and regulation of the land and naval forces, and pursuant to these powers it lies within the discretion of the Congress to determine the occasions for expansion of our armed forces, and the means best suited to such expansion should it prove necessary.

2) An ability to mobilize rapidly is essential to the preservation of our national security.

3) A functioning registration system is a vital part of any mobilization plan.

4) Women make an important contribution to our national defense, and are volunteering in increasing numbers for our armed services.

5) Women should not be intentionally or routinely placed in combat positions in our military services.

6) There is no military need to include women in a selective service system.

7) Present manpower deficiencies under the All-Volunteer Force are concentrated in the combat arms—infantry, armor, combat engineers, field artillery and air defense.

8) If mobilization were to be ordered in a wartime scenario, the primary manpower need would be for combat replacements.

9) The need to rotate troops and the possibility that close support units could come under enemy fire also limits the use of women in non-combat jobs.

10) If the law required women to be drafted in equal numbers with men, mobilization would be severely impaired because of strains on training facilities and administrative services.[16]

11) Under the Administration's proposal there is no proposal for exemption of mothers of young children. The Administration has given insufficient attention to necessary changes in Selective Service rules, such as those governing the induction of young mothers, and to the strains on family life that would result from the registration and possible induction of women.[17]

12) A registration and induction system which excludes women is constitutional.

Report of the Subcommittee on Manpower and Personnel on the Rejection of Legislation Requiring the Registration of Young Women under the Military Selective Service Act at 7–8.[18]

Defendant's main argument may be summarized as follows: women cannot fill all

---

**16.** We need not consider the impact of equal induction of men and women since that issue is not before us, as explained above. We are only considering the total exclusion of women.

**17.** We need not consider the argument that mothers of young children should not be drafted. That issue is not before us. The policy for deferring or exempting certain women from the Selective Service System for justifiable grounds may be established by Congress. See Deposition of Richard Danzig, Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics at 14 (May 14, 1980). The issue before us is the total exclusion of women from registration, not the required induction of certain women into the armed services.

**18.** Certain potential justifications can be dealt with summarily. No argument was made by defendants that the exclusion of women from the MSSA was justified on the grounds that it remedies past discrimination against women. Cf. Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

Also, defendants did not actively pursue the arguments that pregnancy and menstruation adversely affected the military's ability to utilize women. Women in the military as a group suffer only about half the lost time of men. Dept. of Defense, Background Study—Use of Women in the Military at 28 (2d Ed. 1978); Dept. of the Navy, Pregnancy in the Navy: Impact on Absenteeism, Attrition, and Workgroup Morale at vii, viii, 37 (1978).

The height and weight differences of the female population exist but are not considered insurmountable, and at times can be an advantage. Oriental men are also significantly lighter and shorter than Caucasians on the average, but this in no way precludes their use in the military, nor has it precluded various Asian nations from fielding very effective fighting forces. See Dept. of Defense, Background Study—Use of Women in the Military at 25–27 (2d Ed. 1978). The increased successful utilization of women in the armed forces, and the fact that the issue of women in combat is not before us removes the need to go into depth on this issue.

One question often raised is whether men and women can serve together efficiently in the Armed Services. Perhaps the best answer is that they are doing so now without apparent difficulty. Presidential Recommendations for Selective Service Reform: A Report to Congress Pursuant to P.L. 96–107 at 14 (Feb. 11, 1980).

The Director of the Selective Service System testified that there are no administrative obstacles to running a registration and induction process including both males and females. Deposition of Bernard Rostker at 17–18 (May 13, 1980). There is no contradictory evidence in the record.

According to the Selective Service System seventy-two countries in the world have military conscription, and ten of these register or conscript both men and women. None use

# 600

positions in the armed services, especially combat positions; in a time of mobilization the primary need of the military services will be in combat related positions and in support position personnel who can readily be deployed into combat; therefore, in order to maximize the flexibility of personnel management, women should be excluded from the MSSA.[19] Further, defendants argue that we should defer to the congressional determination that this is the best way to run our armed forces. This argument is superficially appealing but is found lacking upon closer examination.[20]

In a time of military mobilization the Department of Defense (DOD) estimates

that it would require approximately 650,000 inductees within the first six months, and that it could advantageously use 80,000 women among the 650,000 inductees. The DOD's view is that women would be useful in a mobilization, though not necessary since there is a sufficient male population to supply the 650,000 inductees.[21]

There are presently 150,000 women on active service in the armed forces. By 1985 it is projected that there will be 250,000. The projection of 80,000 women inductees in a time of mobilization reflects needs in addition to the 150,000 to 250,000 women who would already be in the services and takes into account the statutory and policy restrictions on women in combat.[22] Testi-

women in combat. Testimony of Bernard T. Rostker, Director of the Selective Service System, before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 36–37 (March 19, 1980).

**19.** Counsel have termed this the "Battle of the Bulge" argument.

GENERAL ROGERS. Mr. Chairman, may I add a footnote to my comment to Senator Warner?

SENATOR NUNN. Yes, General.

GENERAL ROGERS. One thing which is often lost sight of, Senator, is that in an emergency during war, the Army has often had to reach back into the support base, into the supporting elements in the operating base, and pull forward soldiers to fill the ranks in an emergency; that is, to hand them a rifle or give them a tanker suit and put them in the front ranks.

SENATOR WARNER. General Patton did that at one time, I believe at the Battle of the Bulge.

GENERAL ROGERS. Absolutely.

Now, if that support base and that operating base to the rear consist in large measure of women, then we don't have that opportunity to reach back and pull them forward, because women should not be placed in a forward fighting position or in a tank, in my opinion. So that, too, enters the equation when one considers the subject of the utility of women under contingency conditions.
Testimony of General Bernard W. Rogers, Chief of Staff, United States Army, before the Subcommittee on Manpower and Personnel of the Committee on Armed Services of the United States Senate at 16 (March 13, 1979); see also Deposition of Major General R. Dean Tice at 30 (May 13, 1980). As noted below, this problem was taken into account when the armed services estimated they could utilize signifi-

cant numbers of female inductees in a time of military mobilization.

General Rogers, himself, testified in favor of the registration of women. See note 30, infra.

**20.** There was some support on the record for the "Battle of the Bulge" argument in the form of opinion testimony taken at depositions in 1976. See Deposition of Major General Robert G. Gard, Jr., Commander of the United States Army Military Center (December 21, 1976); Deposition of John F. Ahearne, Principal Deputy Assistant Secretary of Defense for Manpower and Reserve Affairs (October 19, 1976). We discounted this testimony for obvious reasons. This testimony came from military personnel before all the empirical military studies and the increased utilization of women in the armed forces described below. The current uniform opinion of the armed services and Department of Defense is that women inductees could be utilized, and that it would be valuable to include women in the pool of registrants available for the draft.

**21.** Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower Personnel of the Senate Armed Services Committee at 23 (March 19, 1980); Testimony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Military Personnel of the Committee on Armed Services of the House of Representatives at 2 (March 5, 1980).

**22.** With the advent of the Korean War an unsuccessful effort was made to recruit some 100,000 women to meet rapidly expanding personnel requirements. Dept. of Defense, Background Study—Use of Women in the Military

mony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics, before the Subcommittee on Military Personnel of the Armed Services Committee of the House of Representatives at 35–39 (March 5, 1980). As was further explained to Congress, the figure of 80,000 female inductees does not represent an estimate of the number of positions women could fill—i. e. noncombat, noncombat reserve positions—but represents the number of female inductees that would be of overall benefit to the effectiveness of a mobilization plan. *Id.* at 49–50. The scenario envisioned is as follows: upon a military mobilization the immediate need would be combat troops; [23] male inductees cannot be moved into basic combat positions until after twelve to fourteen weeks of training, and considerably more for highly skilled combat positions; the only immediate deployable source of combat trained manpower would be existing male military personnel on noncombat assignment; the immediately deployable male military personnel are, to a substantial degree, in positions where they do clerical and typing work, nursing and other similar jobs which in the civilian work force are disproportionately filled by women; [24] the pool of female registrants would have a strong concentration of skills not largely available among the pool of male registrants; [25] thus inducted women could be moved into noncombat

at 3 (2d Ed. 1978). It is very possible that the utilization projection for women may not be filled solely through volunteers, just as the nation's total needs may not be filled by volunteers. That is the reason for a selective service system.

23. Historically, approximately one out of seven, and by some estimates less than one out of ten, male inductees have been utilized in combat roles. Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics and remarks of Senator Cohen before the Subcommittee on Manpower and Personnel of the Senate Armed Forces Committee at 47 (March 19, 1980); Remarks of Senator Warner, *id.* at 61. However, it is clear at certain times in history the requirement for combat troops has escalated for short periods of time. This is probably less likely in this time of high technology warfare.

24. Mr. Weinberg: During war time were conscripts placed in noncombat specialties, clerical, secretarial roles for example? Major General Tice: Certainly. Deposition of Major General Tice, Deputy Assistant Secretary of Defense for Military Personnel Policy at 10–11 (May 13, 1980).

25. As a representative of the DOD testified:
A The Department has been explicit in public testimony that we cannot fight a war with a volunteer Army, we would immediately request authority to resume the operation of the Selective Service System in a national emergency.
Q So that when you say in case of war, it would still be true that the women in the armed forces are doing work essential to the readiness and capability of the forces and that the number doing similar work would inevitably expand beyond the peacetime number, that is in full contemplation of there being a draft during the war situation?

A Yes.
Q Now on page two of your prepared testimony, you comment on the advantage of registration of women because it would provide a pool of trained personnel in areas where women have traditionally held the majority of jobs. When you say where women have traditionally held the majority of the jobs—such as administrative, clerical, health care medical fields—are you talking about women in the military or women in society at large?
A Women in society at large.
Q So that the pool of trained personnel from which the military could hope to obtain those same skills for its expanded needs in wartime would be primarily a female pool?
A Yes. To the extent that that is true of the society at large, yes, that's true.
Deposition of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics at 12–13 (May 13, 1980). Of course this does not mean that women volunteers or inductees would not serve in many other nontraditional roles.

In the Vietnam conflict, more than 7,000 women served in support roles which qualified for combat pay. Statement of Bernard D. Rostker before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 2 and 6 (March 19, 1980).

Tested in both long term and short term combat related field exercises it was found that women in support units and unit headquarters above battalion size, in levels up to thirty-five percent, did not adversely affect unit performance. Dept. of Defense, Background Study—Use of Women in the Military (2d Ed. 1978).

The role of women in the military has been constantly expanding and the success of this expansion has continuously encouraged further expansion. *See* Department of Defense, Background Study—Use of Women in the Military;

jobs with little or no training and release men for immediate deployment into combat. Inducted women could complete work left undone by the combat deployment of the men in noncombat units.[26]

"The purpose of registration is to equip us with information so that if we had a national mobilization, we could move quick-

Dept. of Defense, America's Volunteers—A Report on the All-Volunteer Armed Forces (1978); Presidential Recommendations for Selective Service Reform; A Report to Congress Pursuant to P.L. 96–107 (Feb. 11, 1980). The illustration above is one scenario where the skills in the female population would be a positive benefit to military mobilization.

**26.** The following testimony is illustrative:

Mr. Pirie. That is correct, we would choose them for positions that the Armed Forces could effectively use them for, as I said before.

Secondly, as I also said before, it is reasonable in a limited pool to expect people who are trained and have skills that would be immediately available and very useful, such as fire protective skills and medical skills, releasing men who would be immediately deployable.

The problem with the drafted man is that it takes twelve weeks of training to make that man employable. However, a woman who is drafted would require little, if any, training to move into a noncombat job to release a man *who had previous training who was immediately deployable.*

Mr. Wincup. For this purpose you are saying to release another. That could be a man or a woman.

Mr. Pirie. It could be a man or woman. As I pointed out on some of these things it might take time to train a man whereas if you had a woman already trained in that noncombat skill that would be a plus.

Testimony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics, before the Subcommittee on Military Personnel of the Armed Services Committee of the House of Representatives at 49–50 (March 5, 1980).

Mr. Pirie explained more fully at his deposition:

Q The concept of freeing individuals who are already in the service for combat use is the topic that I am raising here.

A It is very important, because by law we are not allowed to deploy individuals who have been conscripted from civilian life to *combat theaters for the purpose of combat* unless they have a minimal amount of training.

Q That minimum is specified in the statute?

ly to achieve our wartime personnel requirements with greater effectiveness." Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 34 (March 19, 1980).[27]

A That minimum is specified in the statute, and it's my recollection that it's 14 weeks. So there is a serious question about what you do between week one and week 14 if you are short people to engage in combat.

. . . .

Q But in order to meet that 380,000 man shortfall in the combat slots, would the people already in the military in noncombat slots comprise the most readily available source for picking up that shortfall, for meeting that shortfall?

A Yes. The armed forces would, I believe, strip what are called TDA units, that is, units that are not combat-deployable units to provide individuals as fillers.

Q And in terms of continuing to fulfill the overall mission objectives of the armed force, would the quality of the immediate replacements of those people be an important factor in the TDA area?

A Yes. The TDA units have an immensely important job in themselves to perform because they support the mobilization of the manpower that is to come beyond. That includes organizing the services of supply, organizing and training the movement of units while they are still in the United States, and a host of different things. So it is very important that those TDA units, if they are used, be supplemented.

Deposition of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs, and Logistics at 20–25 (May 13, 1980). Section 4(a) of the MSSA, 50 U.S.C.App. § 454(a), contains the twelve week training requirement.

**27.** As described, the skills concentrated in the female population, ages 18 to 26, and not equally concentrated in the analogous male population can be highly valuable to the military. Testimony of Richard Danzig, Principal Deputy Assistant Secretary for Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 60 (March 19, 1980).

A special skills draft, though not used in the past in this country except for medical doctors, is not an impossible alternative in a time of military need. Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Lo-

If women were registered ... we would have a very large pool of women whose location would be known, and who would be available to be called up, classified and examined in case induction or conscription were required by national emergency. The Armed Services would have to determine the number of women that they needed both for purposes of expanding the forces and support forces and the support jobs that they have to do, and also for releasing men from the support functions to combat functions.

Testimony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics, before the Subcommittee on Military Personnel of the Armed Services Committee of the House of Representatives at 28–30 (March 5, 1980). Thus, military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.

It is difficult for us to accept the inconsistent positions of Congress. Congress has continuously allocated funds for the increase of the number of women in the armed services, in both absolute terms and as a percentage of total forces.[28] There can be no doubt that the experience of women in the all volunteer army has been a success story. Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 48–50 (March 19, 1980).

It is incongruous that Congress believes on the one hand that it substantially enhances our national defense to constantly expand the utilization of women in the military, and on the other hand endorses legislation excluding women from the pool of registrants available for induction. Congress allocates funds so that the military can use and actively seek more female recruits but nonetheless asserts that there is justification for excluding females from selective service, despite the shortfall in the recruitment of women.[29] Congress rejects the current opinion of each of the military services and asserts that women can contribute to the military effectively only as volunteers and not as inductees.[30]

gistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 60 (March 19, 1980). A skills draft is obviously more manageable now that we have greatly improved computer technology which could instantaneously inform selective service of the names of registrants with particularly needed skills if such information was gathered and programmed for retrieval.

28. Women have increased from .78 percent of the armed services in 1967 to over five percent in 1977, and to eight percent today. Dept. of Defense, Background Study—Use of Women in the Military at 5 (2d Ed. 1978). The projection is for women to comprise twelve percent of the armed forces by 1985. Presidential Recommendations for Selective Service Reform: A Report to Congress Pursuant to P.L. 96–107 at 42, Record at 289 (Feb. 11, 1980).

The army has been significantly expanding the positions open to women. U.S. Army, Evaluation of Women in the Army (1978) Record at 634; Dept. of Defense, America's Volunteers—A Report on the All-Volunteer Armed Forces at 75 (1978). "These changes in Army policy are not whims, but are based on extensive study." Dept. of Defense, America's Volunteers—A Report on the All-Volunteer Armed Forces at 76 (1978). In the mid-1970's Congress opened the military service academies to women. E. g. 14 U.S.C. § 182(a). Congress repealed the statutes excluding women from combat in the army when it abolished the Women's Army Corps as a separate entity within the regular Army. 92 Stat. 1627, repealing, 10 U.S.C. § 3071. If we were to accept defendants' argument that the exclusion of women is necessary for an effective armed service, the inevitable sequitur of these increased numbers is that the military is intentionally and progressively weakening our armed forces.

29. The army has experienced a twenty-five percent shortfall of its objectives in the recruitment of women. Testimony of General Bernard W. Rogers, Chief of Staff, United States Army, before the Subcommittee on Manpower and Personnel of the Committee on Armed Services of the United States Senate at 14 (March 13, 1979).

30. The representatives of the various armed services all testified that they would have no objection to the registration of women. Testimony of General Bernard W. Rogers, Chief of Staff, United States Army, Admiral Thomas B. Hayward, Chief of Naval Operations, General Lew Allen, Jr., Chief of Staff, United States Air Force, and General Louis W. Willson, Com-

The President, the Director of the Selective Service System, and representatives of the Department of Defense informed Congress that including women in the pool of registrants eligible for induction would increase military flexibility. The record reveals that in almost any conceivable military crisis the armed forces could utilize skills now almost entirely concentrated in the female population of the nation. Congress itself has appropriated funds for the increased recruitment and utilization of women in the armed services.

The problem with defendants' argument is that the record before us proves that there already is extensive utilization of females in the military and that this utilization will substantially increase. The die is already cast for substantial female involvement in the military. Furthermore, the military does not lose flexibility if women are registered because induction calls for females can be made according to military

mandant, United States Marine Corps before the Subcommittee on Manpower and Personnel of the Committee on Armed Services of the United States Senate at 10–11 (March 13, 1979).

> [W]omen should be required to register ... in order for us to have an inventory of what the available strength which is within the military qualified pool in this country.

Testimony of General Bernard W. Rogers, Chief of Staff, United States Army before the Subcommittee on Manpower and Personnel of the Committee on Armed Services of the United States Senate at 10 (March 13, 1979).

> From my standpoint looking at the situation, the starting point is looking out at the mobilization population, its potential, and confronting the question, do we wish to exclude from the potential availability for mobilization some 51 percent of the young people of this country?
>
> If in fact there were good military reasons for their exclusion, I would personally favor their exclusion and leave it to the courts to make their own decision. If there are not reasons for excluding that portion of the population, then in fact I would register women and leave to the courts what judgments the courts would make.
>
> Our conclusion is that there are good reasons for registering those people. Our conclusion is even more strongly that there are not good reasons for refusing to register them. I think all the comments about burdens and about what the courts may do and so forth is just reflective of an underlying reality and not any subtle intricacies of case law.

Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 28–29 (March 19, 1980).

> Mr. Montgomery. Why do we want to clutter up the situation by talking about women? What we are really going to need, what the military needs now, both the Army and the National Guard, we need men. We need men to fill the combat roles. We don't need women. Why do we want to create a problem? We have a hard enough time to get men in peacetime registration.
>
> Mr. Pirie. Not only will we need to expand combat arms, as I say, that is the pressing need, but we also have to expand the support establishment at the same time because that meets the situation where the combat arms can carry out their function successfully, and the support establishment now uses women very effectively, and in wartime I think the same would be true.

Testimony of Robert B. Pirie, Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics, before the Subcommittee on Military Personnel of the Committee on Armed Services of the House of Representatives at 24–25 (March 5, 1980).

> It is in the interest of national security that, in an emergency requiring the conscription for military service of the nation's youth, the best qualified people for a wide variety of tasks in our armed forces be available. The performance of women in our Armed Forces today strongly supports the conclusion that many of the best qualified people for some military jobs in the 18–26 age category will be women. The Administration strongly believes they should be available for services in the jobs they can do.

Statement of Robert B. Pirie and Bernard Rostker before the Subcommittee on Military Personnel of the Armed Services Committee of the House of Representatives at 2 (March 5, 1980).

> [S]hould I say in advance that I will only take men and refuse to take women, the answer to that I think is no, I have no basis for saying that.

Testimony of Richard Danzig, Principal Deputy Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee at 62 (March 19, 1980).

needs as they accrue in the future.[31] Though military flexibility might call for less utilization of female inductees than male inductees in a given crisis situation, it is the antithesis of "flexibility" to exclude women from the pool of registrants that could be called upon in a time of national need.

## IV. CONCLUSION

It is undisputed that the MSSA creates a gender-based classification and that the government has the burden of justifying that classification. The principal reason the government proffers for a male-only registration is that it provides military flexibility. The record here, however, reveals that women do serve a useful role in the military and provide important skills. The foregoing discussion also illustrates that flexibility is not enhanced, but is in fact limited by the complete exclusion of women. We therefore hold that the complete exclusion of women from the pool of registrants does not serve "important governmental objectives" and is not "substantially related," *Craig v. Boren, supra* 429 U.S. at 197, 97 S.Ct. at 456, to any alleged government interest. Thus, the MSSA unconstitutionally discriminates between males and females. Declaratory and injunctive relief will be granted.

### ORDER

AND NOW, this 18 day of July, 1980, IT IS ORDERED that:

1. The class is hereby redefined to include:

All male persons who are registered under 50 U.S.C.App. § 453 or are liable for training and service in the armed forces of the United States under 50 U.S.C.App. §§ 454, 456(h) and 467(c); and who are also either subject to registration under Presidential Proclamation No. 4771 (July 2, 1980) or are presently registered with the Selective Service System.

2. The Military Selective Service Act, 50 U.S.C.App. §§ 451 *et seq.* is declared to be in violation of the Fifth Amendment to the United States Constitution for the reasons set forth in the accompanying opinion.

3. Defendants are hereby permanently enjoined from requiring the registration under the Military Selective Service Act of any member of the plaintiff class.

4. Defendants' counsel shall, within ten days, repaginate the Joint Documentary

---

**31.** At the March 5, 1980, hearing held by the Subcommittee on Military Personnel of the Armed Services Committee of the House of Representatives, Robert B. Pirie, Jr., Assistant Secretary of Defense for Manpower, Reserve Affairs and Logistics testified:

It is doubtful that a female draft can be justified on the argument that wartime personnel requirements cannot be met without them. The pool of draft eligible men (ages 18 to 26) is sufficiently large to meet projected wartime requirements. Furthermore, men, unlike women, can be assigned to any military position including close combat jobs.

However, women can be used in large numbers in the peacetime and wartime force. The maximum number of women that can be used is subject to three constraints: (1) legislative prohibitions against the use of women in certain military positions, (2) the policy to reserve certain assignments, such as ground combat roles, for men only, and (3) the need to reserve a substantial number of non-combat positions for men in order to provide a pool of ready replacements for ground combat positions.

A change in the Selective Service Act to permit the registration and induction of women would not necessarily mean that significant numbers of women would be drafted. If women were subject to the draft, the Department of Defense would determine the maximum number of women that could be used in the Armed Forces, subject to existing constraints and the needs of the Military Services to provide close combat fillers and replacements quickly. We estimate that this might require at least eighty thousand additional women over the first six months. If there were not enough women volunteers, a separate draft call for women would be issued.

The President's decision to ask for authority to register women is based on equity. It is a recognition of the reality that both men and women are working members of our society and confirms what is already obvious throughout our society—that women are now providing all types of skills in every profession. The military is no exception. Since women have proven that they can serve successfully as volunteers in the Armed Forces, equity suggests that they be liable to serve as draftees if conscription is reinstated.

and Stipulated Record, Volumes I through IV, inclusive, in a legible manner, and submit the same to this court. Defendants' counsel shall, with the submission of the repaginated Joint Documentary and Stipulated Record, supply this court with the record page citation for each record citation in the accompanying opinion.